UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 05-43(DSD/JJG)


Abdelaziz Sguiri,

             Plaintiff,

v.                                                    **ORDER**

Independent School District
112, Jeff Poppler and
Jim O'Connell,

             Defendants.


      Jordan S. Kushner, Esq., Law Office of Jordan Kushner, 431 South Seventh Street, Suite 2446, Minneapolis, MN 55415, counsel for plaintiff.

      Nell E. Mathews, Esq., Karen B. Andrews, Esq. and Rider Bennett, LLP., 33 South Sixth Street, Suite 4900, Minneapolis, MN 55402, counsel for defendants ISD 112 and Jim O'Connell.

      James F. Roegge, Esq., Bradley J. Lindeman, Esq. Debra L. Weiss, Esq. and Meagher Geer, P.L.L.P., 33 South Sixth Street, Suite 4200, Minneapolis, MN 55402, counsel for defendant Jeff Poppler.


      This matter is before the court upon defendants' motions for summary judgment.  Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court grants defendants' motions.


**BACKGROUND**

      This is an employment discrimination action under 42 U.S.C. §§ 1981, 1983, 1985 and 1986, Title VII of the Civil Rights Act of

1964, the Minnesota Human Rights Act ("MHRA") and Minnesota common law. Defendant Independent School District 112 ("District") is a public school in Carver County, Minnesota. The District employed plaintiff Abdelaziz Sguiri as a custodian in its offices and Early Childhood Center ("ECC") from January 2000 to early October 2004. (Compl. ¶ 8.) Defendant Jeff Poppler is head custodian of the ECC. Defendant James O'Connell[1] is the District's Director of Administrative Services and is responsible for deciding whether to terminate a District employee. Sguiri claims that defendants subjected him to a hostile work environment, forced him to resign based on race and national origin and conspired to deprive him of equal protection of the laws. Sguiri also claims that Poppler defamed him and intentionally interfered with his contractual employment.

Sguiri was born in Morocco, immigrated to the United States in 1997 and became a United States citizen in 2003. He describes his racial or ethnic background as Arabic, African and Moroccan. In January of 2000, Sguiri began working for the District as a custodian at the ECC and the District office. Around August of 2001, he began working only at the ECC and assumed the position of night lead custodian. Sguiri stopped working at the district office because, among other things, he did not like working with

---

[1] O'Connell is named as "Jim O'Conell" in the caption of this action.

other people at that location and his supervisors had accused him of arriving late to work.  (See Sguiri Dep. at 52-54.)

At the ECC, Poppler was the head custodian and Sguiri's direct supervisor.  During the school year, Poppler and Sguiri worked consecutive shifts that overlapped by approximately fifteen minutes.  In the summer, they both worked day shifts that largely overlapped.  At times, Poppler and Sguiri appeared to get along quite well.  For example, they helped each other with home projects and ate together on occasion.  Poppler believed they got along well most of the time, but Sguiri alleges that they just pretended to get along.

Despite any apparent friendship between the two, Poppler and Sguiri regularly complained about one another to ECC Principal James Miller.  Their complaints often revolved around work performance and temperament.  A typical sequence of events would involve Miller receiving a complaint from Poppler or a teacher about Sguiri's work performance, such as inadequate cleaning.  When Miller confronted Sguiri, Sguiri would either respond agreeably or complain about excessive expectations and how much he had to clean compared to Poppler.  On occasion, both Poppler and Sguiri complained to Miller about the other's tendency to get angry and lose his temper.

Poppler and Sguiri regularly insulted and cursed around one another.  Sguiri alleges that Poppler would also yell and swear at

3

other District employees.  (Sguiri Dep. at 48-49, 58, 91.)  The
insults to Sguiri included referring to him as a relative of Osama
Bin Laden and telling him to go back to where he came from.  (Pl.'s
Ans. to Interrogs. at 2.)  Poppler contends that the exchanges were
always in jest, but Sguiri says that he understood Poppler's
cursing and insults to be serious after Poppler complained about
Sguiri's work performance in the summer of 2002.  As a result of
Poppler's complaints, on August 6, 2002, Miller, Poppler and Paul
Schlueter, the Director of Buildings and Grounds, met with Sguiri
to address his alleged failure to work his assigned schedule,
inappropriate use of the internet and poor work performance, among
other things.  (See Lindeman Aff. Ex. F.)  Sguiri agreed that his
internet use was excessive, but disputed the remaining issues.
Nevertheless, Sguiri received a verbal warning regarding his
timeliness, use of the internet and overall work performance.

Sguiri alleges that he informally complained to Miller a
"couple times" about Poppler's racial and ethnic comments and that
Miller did not remedy or attempt to remedy the situation.  (Sguiri
Dep. at 93.)  The record does not indicate when Sguiri made such
complaints.  By contrast, Miller responds that Sguiri only ever
complained of Poppler's work performance and attitude.

On July 22, 2003, almost one year after receiving the verbal
warning for work-related issues, Sguiri filed a formal, written
complaint against Poppler.  The complaint concerned three notes

Poppler had written to Sguiri between April 14 and July 21, 2003, that contained swearing and vulgarities. (See Lindeman Aff. Ex. H at 2-4.) Sguiri indicated on the complaint form that the notes created an uncomfortable work environment. In response, Miller and Schlueter met with Poppler, gave him a verbal warning to cease such behavior and placed a disciplinary letter in his file. (See Arff Aff. Ex. I.) At the meeting, Poppler expressed frustration with supervising Sguiri. Miller and Schlueter agreed to investigate Sguiri's alleged performance issues and help improve communication between Poppler and Sguiri.

Soon thereafter, custodial supervisor Larry Dvorak began inspecting the ECC and reviewing Sguiri's job performance. Dvorak concluded that Sguiri repeatedly left work before his shift was over, did not adequately perform his custodial duties and failed to follow Poppler's instructions. As a result, on August 1, 2003, Sguiri received a verbal warning from Dvorak with specific instructions on improvement. (See Lindeman Aff. Ex. J.) Further, the District decided that in lieu of verbal instructions, Poppler would give Sguiri written, weekly instructions.

Sguiri alleges that Poppler continued to refer to Sguiri's ethnicity and to call him "Bin Laden" during the 2003-2004 school year. (Sguiri Dep. at 113.) However, he does not know if he told

Miller or any other District supervisory personnel about the comments. (Id.) The only alleged complaint by Sguiri after July 22, 2003, was that Poppler had not "changed at all." (Id. at 117.)

More than a year passed before the next documented incident between Sguiri and Poppler occurred. On Monday, September 20, 2004, Sguiri asked Poppler to sign his overtime card indicating he had worked the previous Saturday from 10:00 a.m. to 1:00 p.m. Poppler refused because he did not believe Sguiri worked the overtime indicated. However, Miller signed the overtime card after Sguiri stated that he had indeed worked the overtime hours indicated. The next day, Poppler told Miller that he believed Sguiri had committed timecard fraud. Miller confronted Sguiri about Poppler's allegation. Sguiri responded that perhaps he had worked on the previous Sunday rather than Saturday.

To confirm Sguiri's overtime, Miller checked video surveillance recordings for the previous Saturday and Sunday. The videotapes showed that Sguiri did not go to work on Saturday but did arrive for work on Sunday for a total of about thirty minutes, from approximately 3:40 to 4:10 p.m. Based on the videotapes and the fact that Sguiri did not sign in to work on that Sunday, Miller reported the incident to O'Connell.

The next day, on September 22, 2004, Sguiri and Poppler had a confrontation. It began with Poppler telling Sguiri to clean a spot on the floor. Sguiri alleges that Poppler swore at him and

denies that he used any inappropriate language.  Poppler denies
swearing and alleges that Sguiri threatened to "get rid" of him.
(See Boll Dep. at 21.)  The next morning, Poppler called the police
because of Sguiri's alleged threat.  Poppler told the investigating
officer that Sguiri was "one of Bin Laden's people" and should go
back where he came from.  (Id. at 12, 14-15.)  The investigating
officer concluded that the incident involved a personality conflict
and that no further action was necessary.  (Id. at 18.)

Based on the incidents concerning Sguiri's timecard and
alleged threat to Poppler, O'Connell interviewed Sguiri on
September 23, 2004.  Also present at the meeting were Miller and a
union representative.  Sguiri again explained that he worked the
overtime hours set forth on his timecard on the previous Sunday,
September 19, rather than the previous Saturday.  He also said he
worked an additional two to three hours that same Sunday afternoon.
Sguiri denied threatening Poppler and reported his version of the
conflict.  Sguiri does not remember reporting any racial or ethnic
comments by Poppler.

At the conclusion of the meeting, O'Connell placed Sguiri on
administrative leave for two weeks while the District further
investigated the timecard and alleged threat incidents.  The
investigation revealed that Sguiri was involved in previous
incidents of timecard misuse and had made other ECC personnel feel
threatened or intimidated.  On or about September 30, 2004, Sguiri

contacted O'Connell by telephone.  Sguiri alleges that he told O'Connell at that time about the racial harassment he had endured from Poppler.  He also alleges that O'Connell asked him if he wanted to resign his employment.[2]  That same day, Sguiri met with O'Connell and the human resources manager.  O'Connell told Sguiri that the investigation was almost complete and that if he resigned, he would receive benefits and vacation pay.  By contrast, if the District terminated him, he would not receive benefits or pay. Sguiri understood O'Connell to mean that he had a choice between resignation or termination.

On October 6, 2004, Sguiri resigned.  On October 21, 2004, he filed a grievance through the union based on the allegation that he was forced to resign.  O'Connell rejected the grievance as untimely because the labor agreement allowed Sguiri only ten days after his resignation to file such a grievance.

Sguiri brought this action against defendants on January 7, 2005, claiming hostile work environment, discrimination based on race and national origin and conspiracy to deprive him of equal

---

[2]  O'Connell asserts that Sguiri first brought up the issue of resignation, indicating that he may want to resign rather than be terminated.

8

protection of the laws.[3]  Sguiri also brings claims of defamation and intentional interference with contractual relations against Poppler.  Defendants now move for summary judgment on all claims.

## DISCUSSION

### I.    Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)(quoting Fed. R. Civ. P. 56(c)). A fact is material only when its resolution affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  See id. at 252.

---

[3]    Sguiri also mentions in his complaint retaliation and discrimination based on religion and sex but has not responded to defendants' arguments concerning those claims.  Therefore, the court presumes Sguiri has abandoned them.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 255.  The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial.  See Celotex, 477 U.S. at 324.  Moreover, if a plaintiff cannot support each essential element of his claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial.  Id. at 322-23.

## II.  Discrimination Claims

### A.   Hostile Work Environment Claim

Defendants argue that Sguiri has failed to establish a prima facie case of hostile work environment under 42 U.S.C. §§ 1981 and 1983,[4] Title VII and the MHRA.  The same analysis applies to a hostile work environment claim under all four statutes. See Wright v. Rolette County, 417 F.3d 879, 884 (8th Cir. 2005) (Title VII and § 1983); Eliserio v. United Steelworkers of Am. Local 310, 398 F.3d 1071, 1076 (8th Cir. 2005) (§ 1981); LeGrand v. Area Res. for Cmty. & Human Servs., 394 F.3d 1098, 1101 (8th Cir. 2005) (MHRA).  An employee experiences a hostile work environment when "the workplace

---

[4]  Plaintiff has not opposed defendants' motion for summary judgment on any discriminatory custom or policy claim under § 1981 and on his equal protection, due process and privileges and immunities claims under § 1983.  Therefore, the court considers such claims abandoned.

is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 67 (1986)); Palesch v. Mo. Comm'n on Human Rights, 233 F.3d 560, 566 (8th Cir. 2000). To succeed on a hostile work environment claim, a plaintiff must show that (1) he belongs to a protected group, (2) he was subject to unwelcome harassment, (3) a causal nexus exists between the harassment and the protected group status, (4) the harassment affected a term, condition, or privilege of his employment and (5) defendants knew or should have known of the harassment and failed to take proper action. See Tademe v. St. Cloud State Univ., 328 F.3d 982, 991 (8th Cir. 2003).

To decide whether a plaintiff has demonstrated that the harassment affected a term, condition or privilege of his employment, the court looks at all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 839, 843 (8th Cir. 2002) (citing Harris, 510 U.S. at 21-23). To avoid imposing "a code of workplace civility," the threshold for actionable harm is high. Id. at 843. The harassment

must be so intimidating, offensive, or hostile that it "poisoned the work environment." <u>Scusa v. Nestle U.S.A. Co.</u>, 181 F.3d 958, 967 (8th Cir. 1999) (citations omitted). The "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" does not rise to the level of a Title VII violation. <u>Meritor Sav. Bank</u>, 477 U.S. at 67. Moreover, a plaintiff must show that he was "singled out" because of his protected status. <u>See</u> <u>Williams v. City of Kansas City, Mo.</u>, 223 F.3d 749, 753 (8th Cir. 2000).

As to whether defendants properly responded to Sguiri's complaints of harassment, the court considers (1) the amount of time that elapsed between notice of harassment and the remedial action, (2) what information Sguiri made known to defendants, (3) the nature of the alleged harassment and its extent, (4) options available for remedial action and (5) whether or not defendants' response was reasonably calculated to end the harassment. <u>See</u> <u>Stuart v. Gen. Motors Corp</u>., 217 F.3d 621, 633 (8th Cir. 2000). To avoid summary judgment, Sguiri must do more than make vague and conclusory statements regarding alleged reports of harassment. <u>See</u> <u>Adler v. Wal-Mart Stores, Inc.</u>, 144 F.3d 664, 676 (10th Cir. 1998).

It is undisputed that Sguiri belongs to a protected group and was subject to unwelcome harassment based on his race or national origin. However, Sguiri has failed to show that the harassment

affected a condition of his employment or that defendants knew or
should have known of such harassment and did not take proper
remedial action.  As to the nature of the harassment, Sguiri points
to numerous remarks from Poppler.   Although offensive and
inappropriate, the remarks were not intimidating or threatening so
as to poison the work environment or otherwise affect a term or
condition of Sguiri's employment.  See Jackson v. Flint Ink N. Am.
Corp., 382 F.3d 869, 870 (8th Cir. 2004) ("threat of serious bodily
harm if not death," in combination with highly offensive comments,
was "on the cusp of submissibility" for hostile work environment
claim).  Moreover, Sguiri has not shown that the alleged harassment
unreasonably interfered with his work performance or that Poppler
singled him out for harassment.  To the contrary, Sguiri alleges
that Poppler swore and yelled at "everyone."  (Sguiri Dep. at 48-
49, 91.)

    As to defendant's knowledge of the harassment, Sguiri points
to various alleged informal complaints to Miller and one written
complaint he submitted.  First, Sguiri alleges that he told Miller
informally about Poppler's racial and ethnic harassment a "couple
times" prior to the written complaint he filed on July 22, 2003.[5]
(Sguiri Dep. at 93.)  However, Sguiri has not indicated when he
made those informal complaints, whether immediately before his

---

[5]  Miller denies having received such informal complaints from
Sguiri, but the court will presume Sguiri made the complaints for
purposes of these motions.

13

written complaint or years earlier.  (See id.)  The court finds that such broad vagueness in timing fails to raise a genuine issue of material fact regarding defendants' knowledge.

Second, as to his written complaint, Sguiri may have implicitly identified ethnic harassment but did not mention any racial harassment or check the appropriate box on the complaint form to indicate that any racial harassment had occurred.  Rather, the complaint addressed only race-neutral vulgarities and cursing by Poppler.  Therefore, even if the earlier informal complaints sufficed to make defendants aware of race-based harassment, Sguiri's written complaint implicitly notified them that any prior racial harassment had not occurred or had ceased.  To the extent his written complaint can be construed to have reported ethnic harassment, Sguiri has failed to show that defendants did not adequately respond.

Finally, after the written complaint, Sguiri says he informally complained to Miller that Poppler had not "changed at all." (Sguiri Dep. at 117.)  However, the court finds that such a complaint is too vague and conclusory to raise a genuine issue of fact, especially in light of the varying content or ambiguous timing of his earlier complaints.  Because Sguiri has not shown that the harassment affected a condition of his employment or that defendants knew or should have known of such harassment and did not take proper remedial action, he has failed to establish a prima

14

facie case. Summary judgment in favor of defendants on Sguiri's hostile work environment claim is warranted.

**B.    Termination Based on Race and National Origin**

Sguiri claims that he was forced to resign on account of his race and national origin, in violation of Title VII and the MHRA. The court analyzes his claim under the <u>McDonnell Douglas</u> framework. See <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973); <u>Gilmore v. A T & T</u>, 319 F.3d 1042, 1046 (8th Cir. 2003); <u>Sigurdson v. Isanti County</u>, 386 N.W.2d 715, 719-20 (Minn. 1986). Sguiri must first establish a prima facie case of employment discrimination. <u>McDonnell Douglas</u>, 411 U.S. at 804. If successful, the burden of production then shifts to defendants to articulate a legitimate, nondiscriminatory reason for the alleged adverse employment action. <u>Id</u>. If defendants meet their burden, Sguiri must then show that the proffered justification is merely a pretext for discrimination. <u>Id</u>. At all times, the burden of persuasion remains with the plaintiff. <u>Gagnon v. Sprint Corp.</u>, 284 F.3d 839, 847 (8th Cir. 2002).

To establish a prima facie case, a plaintiff must show that (1) he was a member of a protected class, (2) he was meeting the legitimate expectations of his employer, (3) he suffered an adverse employment action and (4) circumstances exist which give rise to an inference of discrimination. <u>Wheeler v. Aventis Pharms.</u>, 360 F.3d 853, 857 (8th Cir. 2004). A plaintiff fails to establish the

15

second element if he cannot refute specific evidence of his poor work performance.  See Whitley v. Peer Review Sys., Inc., 221 F.3d 1053, 1055 (8th Cir. 2000).  An adverse employment action includes constructive discharge, which occurs when an employer deliberately creates intolerable working conditions in order to force an employee to quit his job.  Bergstrom-Ek v. Best Oil Co., 153 F.3d 851, 858 (8th Cir. 1998).  However, when an employer tells an employee that he will be fired for cause, that "does not, in and of itself, constitute constructive discharge."  Summit v. S-B Power Tool, 121 F.3d 416, 421 (8th Cir. 1997).

A plaintiff can establish an inference of discrimination by showing that similarly situated employees who are not in the protected class were treated differently.  See id.  Alternatively, the fourth element can be satisfied by providing other evidence that he was terminated based on his race or national origin.  See Landon v. Northwest Airlines, Inc., 72 F.3d 620, 624 (8th Cir. 1995) (plaintiff established fourth prong by providing evidence that supervisor was racist and that employer's proffered reason for terminating him was pretextual).

It is undisputed that Sguiri is a member of a protected class. Defendants argue, however, that Sguiri did not meet the District's legitimate expectations, did not suffer an adverse employment action and has not brought forth evidence that gives rise to an inference of discrimination.  The court agrees.

16

As to meeting the District's legitimate expectations, Sguiri asserts that all allegations of his poor work performance, timecard fraud and threatening behavior toward Poppler are inaccurate and unfounded.  However, Sguiri has provided only inconsistent explanations for the timecard issue.  In his deposition, he asserts that he mistakenly claimed overtime on September 18, 2004, from 10:00 a.m. to 1:00 p.m., for overtime he actually worked the following day from 10:00 a.m. to 1:00 p.m. and 3:30 p.m. to 5:30 or 6:00 p.m.  (Sguiri Dep. at 135, 141.)  Such an explanation is inconsistent because the hours he claims to have worked in the afternoon of September 19 were not recorded on his timecard. Moreover, he has failed to explain why the surveillance video shows that he was at work for only thirty minutes that afternoon.  Sguiri also has not refuted the repeated work performance issues and concerns about his threatening behavior towards multiple District employees.  In light of the timecard incident and other unexplained issues of work performance, Sguiri has failed to show that he was meeting the District's legitimate expectations.

As to an adverse employment action, Sguiri contends that he was constructively discharged by having intolerable working conditions and being given a choice to resign or be terminated. However, the court finds Sguiri has failed to show that his working

conditions rose to an intolerable level.[6] As to his alleged choice to resign or be terminated, Sguiri argues that being given such a choice constitutes constructive discharge. However, he has ignored Eighth Circuit caselaw, which holds that such a situation does not constitute constructive discharge if the employer communicates that the employee could be terminated for cause. See Jones v. Fitzgerald, 285 F.3d 705, 716 (8th Cir. 2002) (constructive discharge does not include plaintiff resigning because of belief that she would be terminated for misconduct); Summit, 121 F.3d at 421. Here, Sguiri resigned based on the belief that the District would terminate his employment as a result of his alleged timecard fraud and threatening behavior. The court finds that such a situation does not constitute constructive discharge. Based on all of the above, Sguiri has failed to show that he was subjected to an adverse employment action.

Finally, Sguiri contends that the lack of cause to terminate his employment and the harassment by Poppler constitute inferential and direct evidence, respectively, of discrimination based on race

---

[6]   To the extent Sguiri argues that Poppler's harassment rendered his workplace environment intolerable, his argument fails. Sguiri allegedly endured Poppler's inappropriate behavior on a daily basis for years. However, he did not submit a complaint for an entire year before he resigned and has failed to show that the harassment was hostile. For these reasons, no reasonable person could find that his workplace environment was intolerable as a result of the alleged harassment. See Jones v. Fitzgerald, 285 F.3d 705, 716 (8th Cir. 2002) ("Constructive discharge requires considerably more proof than an unpleasant and unprofessional environment.")

and national origin.  As already discussed, the District had legitimate reasons for investigating and otherwise dealing with Sguiri's alleged misconduct.  Therefore, the court rejects Sguiri's lack of cause argument.  As to harassment by Poppler, Sguiri has not shown any connection between such harassment and the District's investigation into Sguiri's misconduct.  Rather, it is undisputed that Popper did not contribute to the decision-making process, participate in the investigation of Sguiri's conduct or have the authority to terminate Sguiri.  For these reasons, Sguiri has not proffered evidence that raises an inference that his alleged constructive discharge was based on race, even under the "minimal requirements" needed to establish a prima facie case.  See Wheeler, 360 F.3d at 857.

Even if Sguiri could establish a prima facie case, he has failed to show that defendants' stated reason for allegedly forcing him to resign was pretextual.  Defendants assert that they put Sguiri on administrative leave based on his timecard fraud and alleged threatening behavior towards Poppler.  Such incidents constitute legitimate, non-discriminatory justifications for the District's action and shift the burden to Sguiri to show that the proffered justification is pretextual.  See Koons v. Aventis Pharms., Inc., 367 F.3d 768, 778 & n.6 (2004) (employer's honest belief that employee engaged in misconduct constitutes legitimate reason for adverse employment action).

19

As to pretext, Sguiri alleges that the stated incidents justifying the District's actions did not in fact occur.  However, Sguiri's allegation does not explain or address the extensive corroborating evidence the District discovered and relied upon when considering the incidents.  Moreover, the court may not second-guess the wisdom of an employer's decision, but rather only its motivation.  See Rose-Maston v. NME Hosps., Inc., 133 F.3d 1104, 1109 (8th Cir. 1998).  For these reasons, Sguiri has failed to show that the District's stated reason was not honest or mere pretext for its actions.  Because Sguiri fails to present evidence of pretext, summary judgment is appropriate even if he had made his prima facie showing of discrimination.  See Gilmore, 319 F.3d at 1046-47.  Therefore, the court grants summary judgment in favor of defendants on Sguiri's improper termination claim.[7]

**C.  Conspiracy to Deprive Civil Rights**

Sguiri claims that defendants conspired among themselves and with other others to deprive him of equal protection of the laws and failed to prevent such a conspiracy, all in violation of 42 U.S.C. §§ 1985 and 1986.  To support a civil rights conspiracy claim, a plaintiff must show (1) a conspiracy, (2) that the purpose of the conspiracy was to deprive the plaintiff of his civil rights,

_____

[7]   Because Sguiri's discrimination claim fails, so must his claim that Poppler and O'Connell aided and abetted such discrimination in violation of the MHRA.  See Williams v. Metro. Waste Control Comm'n, 781 F. Supp. 1424, 1428 (D. Minn. 1992).

(3) that a conspirator acted in furtherance of the conspiracy and (4) damages.  Mettler v. Whitledge, 165 F.3d 1197, 1206 (8th Cir. 1999).  Speculation and conjecture do not suffice to prove existence of a conspiracy.  Id.

Sguiri has produced no evidence to support his claim that a conspiracy existed to deprive him of his civil rights.  At most, he provides speculation and conjecture that Poppler's comments were related to an alleged agreement by defendants to deprive Sguiri of his public employment.  Therefore, summary judgment in favor of defendants on Sguiri's conspiracy claim is warranted.

## III.  Supplemental Jurisdiction

A district court has discretion whether to exercise supplemental jurisdiction over state law claims joined in a civil action after all claims over which it has original jurisdiction have been dismissed.  28 U.S.C. § 1367(c)(3); see also Franklin v. Zain, 152 F.3d 783, 786 (8th Cir. 1998); Save Our Health Org. v. Recomp of Minn., Inc., 829 F. Supp. 288, 293 (D. Minn. 1993), aff'd, 37 F.3d 1334 (8th Cir. 1994).  The court has determined that defendants are entitled to summary judgment on all claims within its original jurisdiction.  The court declines to exercise supplemental jurisdiction over plaintiff's state law claims.

**CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED** that defendants' motions for summary judgment [Docket No. 18 & 38] are granted.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  May 22, 2006


                                        s/David S. Doty
                                        David S. Doty, Judge
                                        United States District Court